Margo Williams was one of many victims of a complicated, sophisticated, and confusing fraudulent scheme. Ms. Williams specifically was the victim of a romance scam. As foolish as it seems, in hindsight, Ms. Williams believed that she was in an online romantic relationship with the rich and famous actor Tom Hardy. At the imposter Mr. Hardy's instruction, Ms. Williams was deceived into opening an LLC, opening a variety of bank accounts, and transferring approximately $800,000 that, unbeknownst to her, had been stolen by other people in a business email compromise scheme. How long was she involved with the foe Mr. Hardy? Yes, Your Honor. So the relationship, so to speak, started at some point in the summer of 2022. The selfie image that the imposter Tom Hardy had sent to Ms. Williams was dated August of 2022. It would have culminated when the FBI came and visited her and told her that she was a money mule on July 28th of 2023. So approximately one year, Your Honor. I'm here on her behalf seeking relief from her convictions for bank fraud, money laundering, and related offenses. In the alternative, we're seeking resentencing or a reduction in the massive restitution obligation imposed upon Ms. Williams. Subject to the court's questions, I intend to start on the issues related to the trial and specifically the willful blindness instruction. Now each of the eight counts of conviction in Ms. Williams' case required proof beyond a reasonable doubt of her knowledge, essentially, that she was dealing in stolen money. In addition, count one, bank fraud, required proof that she had intent to defraud the victims. And count eight, money laundering conspiracy, required proof of her intent to enter the conspiracy. Over Ms. Williams' objection, the district court instructed the jury that, essentially, even if it didn't find proof beyond a reasonable doubt that Ms. Williams had actual knowledge of illegality, the jury could infer knowledge if it found that she was willfully blind to the high probability of illegality. This was air, and in this close case, it was outcome determinative. There are two requirements for a proper willful blindness instruction. This is drawn from the Supreme Court decision of Global Tech cited in the briefs. First, the defendant must have been subjectively on notice of a high probability of illegality. That requirement is not subject to dispute here because Ms. Williams was so candid with the FBI when they visited her at the culmination of the fraudulent scheme. She told the FBI in that interview that she had some suspicions that the imposter, Mr. Hardy, was able to resolve for her, but she was at least on notice of some red flags. It's the second requirement for a willful blindness instruction where that instruction fails here, and that's the requirement that there be deliberate actions by the defendant to learn to avoid learning of the illegality of the enterprise in which she was involved. It has to be for the purpose of learning, isn't that correct? Excuse me, Your Honor? Essentially, it has to be for the purpose of not learning, isn't that correct? Deliberate in the sense of purposeful. Exactly, and that's what... I mean, that could be deliberate, but still be negligent, but it has to, it's, mere negligence won't do, right? Exactly. But it has to be purposeful as I understand it. That's right, and that distinction is explained in the Global Tech case. The requirement of deliberate, deliberateness, as Judge Arnold said, separates willful blindness from negligence or even recklessness, which is not enough for conviction either. And here, although we look at this issue in the light most favorable to the government, the problem for the government here is Exhibit F, where we have clear evidence that Ms. Williams was conducting some investigation, whether it's enough to avoid negligence, that's a separate issue. But she was conducting online searches over a period of months into Tom Hardy and Tom Hardy-related subjects. And into scams to buy cryptocurrency, which as she explained, that was because she did have some questions about why he was instructing her to convert some of the money into cryptocurrency. She gave her iPad voluntarily to the FBI when they came and visited her on July 28th of 2023. And this is what the FBI found. If she was actually trying to avoid learning as to whether she was dealing with the real Tom Hardy, she would have had no reason to make those online searches. And thus, the uncontroverted evidence is consistent with the notion that she was not deliberate in any attempt to not learn about the illegality. Go ahead. Would a sort of half-hearted effort to learn be a deliberate effort to avoid learning? That makes sense? Oh, well, I did a little bit, and so that's enough. And so I kind of went out of my way to only learn an inch when I really should have dug in and looked at a mile. That may be, Your Honor, if maybe there were only one online search, for example. But as I said, these were searches over a period of months from March 2023 up until the very day that the FBI visited her on July 28th of 2023, showing that there wasn't a point in this whole saga where she was convinced that she was not dealing with the real Tom Hardy. So I take your point. If it was truly a superficial investigation, one online search, that might not be enough to avoid an inference of deliberate indifference. But here, it was a more consistent effort. And so your argument goes to whether that instruction should have been given, not whether the jury could have then concluded that it was willful blindness. Is that correct? Well, it's both. Right now, I'm arguing whether the district court should have given the instruction at all, because there does have to be a prima facie case for willful blindness, and we don't believe that there is. But if the court doesn't agree with that, then we did argue sufficiency of evidence as well, and we don't think a reasonable jury could have concluded that she was willfully blind. I don't agree at all with the government's argument, and the district court suggested this too, that there was some evidence from which the jury could reasonably conclude that Ms. Williams had actual knowledge. I don't agree with that, because it's clear that she thought she was dealing on some level with Tom Hardy. You'd have to imagine that she contrived this whole crazy Tom Hardy story from the beginning, if you were to believe that she had actual knowledge of illegal activity. Not only were there the web searches, she told the FBI that she did reverse Google image searches using the selfie images that the imposter Tom Hardy sent her. And so if you don't know, what you do there is you upload the image to Google, and Google will tell you, is this image from the internet somewhere? And Ms. Williams explained to the FBI, and in her testimony, well, I didn't see any hits on that, so I inferred from that that he took the image himself. We know now it was probably artificial intelligence generated, so she wasn't going to find it anyway, but she didn't know that. And as I said, she showed the FBI one of the selfie images that the imposter Mr. Hardy sent her in August of 2022. So it would be very hard for her to contrive this whole story from the beginning, because there was months-long activity showing that she thought that she was dealing with the real Tom Hardy. If we have concerns about the jury instruction, that's an abuse of discretion standard we're operating at that point, right? And do we subject it then to harmlessness? How does that play out, you know, if I do have some of the concerns you've described here? Is it abuse of discretion and then subject to harmless error? That is all correct, Your Honor, yes. And again, we think this was a close case because there wasn't evidence of actual knowledge, and there was a lot of evidence that Ms. Williams thought she was dealing with Tom Hardy. Again, foolish or not, in hindsight, she was fooled. Did the willful blindness, I mean, was that an issue that was actively litigated in closing, for example? I don't recall, I apologize. How big of an issue did that particular instruction play in the jury's verdict, in your view? I think it played a big role. I would cite specifically the government's closing argument that I referenced in the brief. I believe it's at page 352 or 452, I apologize, of the trial transcript, where the government argued that even if you don't find intent to defraud, Ms. Williams was deliberately indifferent. And so the government argued it as an alternative theory. And as I mentioned in the brief, I don't think that's a permissible alternative theory on bank fraud because willful blindness only goes to knowledge, not to intent to defraud. So I do think it was a big issue, Judge Kobus. It's difficult to say that any case is similar to another willful blindness case because these are all such fact-intensive situations, but the parties spent a lot of time discussing the Barnhart case and the Al-Sharari cases in the briefing. I'd submit that Ms. Williams' case is closer to Barnhart than Al-Sharari. In Barnhart, this court reversed the defendant's conviction for a fraud-related offense based on a willful blindness instruction. That was the case with the executive of the company who was on notice of financial irregularities, was on notice that the company was in some financial trouble, but yet still took the actions that led to him being prosecuted for fraud. There, this court said that even though the defendant was on notice of some problems, that wasn't enough to lead to the conclusion that he was willfully blind. And in our view, that's pretty much the same situation here because it's undisputed that Ms. Williams was on notice of some problems, whether it be from the information she received from the bank, or the frozen funds, or just the general questions about the nature of the enterprise. The issue here is she did not deliberately avoid learning of that illegality. Was there any evidence of her deliberately avoiding the illegality of the transactions themselves? In other words, we've talked about whether she knew this was actually Tom Hardy. She did some investigations into the photo, and I think there were several searches about him in particular. Was he really going through a divorce and those sorts of things? That's one category of evidence. Do we need to also look at the actual transactions? In other words, her interactions with the banks, opening the accounts, being told they're being closed, and not taking any action there. Is there anything involved in that conduct that would be relevant to the willful blindness instruction? I think it's all relevant, Your Honor. But as I said, eventually, if you look at the government's demonstrative exhibit with the web of financial transactions, it's exhibit 42 from the trial, we see that toward the end of the scheme, the money starts to get converted into cryptocurrency. And as I said, when those transactions started happening around that time, that's when Ms. Williams searches online for scams to buy cryptocurrency. Again, as she explained, so that she could gain an understanding as to why he was asking her to transfer the funds into cryptocurrency. So I think it's all relevant, Judge Kelly, but I do think there's also evidence that Ms. Williams did do an investigation into the transactions and the information she was receiving from the banks. If the court has no further questions, I would reserve the remainder of my time for rebuttal. You may. Thank you. Mr. Vabichick. May it please the court, counsel. As well, I would begin my argument with the willful blindness instruction. The district court did not abuse its discretion in giving this instruction, which stated that the jury could infer that the defendant acted knowingly if the jury found beyond a reasonable doubt that she believed the money deposited in her bank accounts was stolen or involved the proceeds of a criminal offense and that she took deliberate action to avoid learning of that fact. And I'd like to focus on some of those deliberate actions about the stolen money. There were, and these are part of on pages 36 to 39 of our brief, red flags to the defendant about the source of the money. There were monthly statements from her banks identifying victim names in whole or in part with the source. How did they do that? What kind of notice was given? Give me an example, please. There are a number of exhibits in the trial record where different banks do it slightly differently, but you get a running statement every month of what you spend, and then you also get descriptions, line descriptions and dates and amounts of what is coming into your account. So, for example, the church's money, it came and it said Garland Construct or something like that, a partial name identifying a source. And she also had, the evidence was on her iPad, she was taking screenshots of individual transactions using mobile banking, and those would also have full or partial victim names. Another red flag was banks were closing her accounts left and right. And instead of asking the banks, what's going on? Why are you closing my account? The defendant would simply move on to another account, deliberately closing her eyes with respect to the nature and source of the money. That might be evidence, too, of full-blown knowledge without regard to any kind of willful blindness. And our primary argument to the jury was actual knowledge. Well, I mean that evidence is evidence of that as well.  Okay, I'm trying to sort this out. And typically when there's a willful blindness, it's usually if the theory is either you knew or you didn't know, that's not willful blindness. There's not a wedge for willful blindness there. Yes, there's a line that often gets repeated in this court's cases on willful blindness, that if the sole question is either you knew or you didn't know, then that's not a willful blindness case. It's those gray cases in between, which most fraud cases are. And this case is an example of a case that, as Mr. Hansen indicated, it's in between the poles of cases out there. And that's why the district court, in our view, didn't abuse its discretion in giving this instruction and then setting out the law correctly, that if you find beyond a reasonable doubt that she deliberately closed her eyes to the fact of the source of the money and it being stolen, that the jury could rely on that. And that was our alternative theory of... Well, and I hear Mr. Hansen saying he concedes the red flag part. It's that deliberate, what's the language, purposely contrived, the deliberate conduct. Can you focus your argument on those acts? Yes, Your Honor. In our view, the deliberate action with respect to, and this goes to your question earlier about, yes, she did some searches about Tom Hardy, and there is that one search of scams involving cryptocurrency. But when it comes down to the actual source of the money, she's getting her bank accounts closed, and she is deliberately closing her eyes to that, not asking any questions. And each time that happens, she moves on to a different bank. It's so striking that when $200,000, some $200,000 of the church's money gets frozen because of concerns about fraud, she doesn't ask any questions, there's no evidence of that, didn't do anything, doesn't want to create a paper trail with respect to that, and just moves on. So that's the deliberate steps, as you're saying, is the deliberate silence or deliberate no action, where someone would be expected to ask? It's that, but it's more because you're going on and just moving on and opening an account elsewhere, starting over. You're leaving the money behind and moving money in a different account. You're taking deliberate actions to not what the ordinary person would do, would be to, hey, you froze $200,000 of my money, you're sending me these letters saying there's unauthorized transitions in my account, and you're not asking any questions about that. I wonder if, I'm sorry, go ahead, if deliberate indifference, willful blindness, if we need to look at it differently in the world of a romance scam like this, where there is technology that is likely outside the the arm's length of someone perhaps like Ms. Williams or a number of us to determine, is that a real photo or was that AI? What are they actually telling me? How does she ever actually confirm some of the information she's seeking on these internet searches? It just seems like it's a new fact world. It's a new fact pattern for willful blindness, because I'm not sure that some of the information was within her reach to learn. The world is changing rapidly every day, your honor. I don't doubt that, and I I would, with respect to the point about her testimony, with respect to the video images of Mr. Hardy, there wasn't corroboration of that, and of course the jury was entitled to disbelieve Ms. the defendant, and also the court did find the defendant having observed her, had perjured herself. What I would say is, to that point further, is that it it's all the more reason why this, the decision to give the instruction based on the evidence before the court was within the district court's discretion. The evidence, as Mr. Hanson pointed out, is to be viewed in a light most favorable to the government, and of course the whole issue of the new trial you're talking about, your honor, is you know, do the instructions as a whole fairly submit the case to the jury, and the defendant did receive, with respect to count one, the bank fraud count, a good faith instruction that was read at the same time as the willful blindness instruction. The parties had different views on that, and the court decided to give both. And the courts, I don't think there's any issue that the  the instruction itself correctly states that the the jury would have to find it beyond a reasonable doubt, that she deliberately and purposely closed her eyes if it wanted to rely on that alternative theory, and then also that negligence, carelessness, and things like that are not enough to impute willful blindness knowledge. I would also stress the line of cases that we've cited, the Lewis and King cases that say a willful blindness instruction is particularly appropriate when the defendant denies any knowledge of a criminal scheme, despite strong evidence to the contrary, and that that did happen here. The defendant emphatically, during her testimony, denied any knowledge of the criminal scheme. I would at this time wish to pivot to the loss and restitution issues, if that would be acceptable to the court. I'm happy to answer questions about any of the major brief points, but I want to make clear with respect to loss and restitution that the district court did not attribute every dollar that was stolen in the larger BEC Business Email Compromise Scheme to the defendant. There was evidence at trial that the CFAIR non-profit out of Seattle, Washington had lost some $300,000 in a business email compromise. A small fraction of that the defendant received, opened an account, received and laundered. And so this is not a case where the district court just sort of attributed all the loss in the case or all the restitution to the defendant. The restitution here and the loss here was attributed to the defendant because it is all money that she personally received in her bank accounts or that shell corporation that she controlled and then that she moved or attempted to move out. So it was relevant conduct, is that it? It was relevant conduct. I was wondering if what you said interests me because I was wondering if the amount was attributed to her because of her conviction on the conspiracy count. It was the conspiracy count and also the charged bank fraud account was charged over a scheme to defraud over many months. Would the conspiracy account would include all the losses then? That's correct. Would not include. Sorry. I think. It would. Okay, I misunderstood you. I thought you were saying there were some losses that were not attributed to her, but were part of a general conspiracy. There were, yes, your honor, there were. She wasn't a member of that conspiracy, is that it? She was a member of that conspiracy. The $300,000, the other $300,000 went to a different Miamuels account. Okay. Even though it was part and parcel of the co-schemers and co-conspirators activity. It wasn't attributed to her. It was not attributed to her. It could have been. I'm just. We didn't pursue that. Okay, so it was just sort of a relevant conduct notion. Okay. Yeah, we under the restitution statute 3663-A-2 it requires the victim suffered direct and proximate losses from the defendants opening the accounts and moving the money. So we didn't seek restitution for that other $300,000. And would the the district court would have had some discretion on the restitution to not assess the entire amount against her, correct? Correct. It's the mandatory victims restitution act. But when it's conduct that is that's jointly undertaken, it seems to me that the statute as a may may attribute it to everyone I suppose jointly and severally or may divide it up. I think your honor may very well be right about that. That wasn't something we sought to do here in any event. And that wasn't right. That wasn't discussed at the because it seems to me that understanding the relevant conduct approach of the guidelines that you discussed with Judge Arnold, I understand that. But restitution, boy, you know, she got $25,000, right? As sort of a gift from the faux Tom Hardy. And so she really was a conduit not getting any financial benefit, maybe only emotional benefit from her conduct. Which of course people for as long as there's been human beings have committed crimes for those reasons. But we haven't had the restitution statute for as long as human beings. So I just was curious as to whether that might have been an option or if it was raised with the district court. No, the defendant's position with respect to guidelines loss is that it should be her gain which would be the approximate $25,000 and then also I'd be remiss if I didn't mention the Louis Vuitton handbag. I'm sorry, the what? The Louis Vuitton handbag. But $25,000 and but under the guidelines because the amount is determinable gain does not, is not the proper measure of guidelines loss or for that matter, restitution. No, no, I am your honor. Thank you. I had a quick question about, your question to her about was she married during the time she was involved in this game. I understand your argument about the relevance of the question, but I wonder did you ask, did you ask the jury to draw any particular inference from her answer? Was it even mentioned during closing or? No, I don't believe I mentioned it at all during closing argument. It was the opposite inference is somewhat stronger. The one that you advanced for as a basis for its admission. The answer, the basis for the question it seems to me that an unfairly prejudicial inference is more likely than the inference that you were asking them to draw, but you didn't ask them to draw any particular inference. Is that right? I did not. I did not mention it again. I'm just curious. Thank you. And may I speak briefly? Yes, well, with your permission. I'll be brief. I just, I just want to make clear. We agreed to not get into that. The defendant opened the door to it because she was putting on this defense consistent with the good faith instruction that she received. That she was in this serious committed relationship with Tom Hardy and then she, we were there and she keeps testifying about it and then she testifies that he was the one she was in this relationship with and the judge, I act consistent with the motion limiting ruling. I asked for a sidebar and he let me ask the one question and she made clear that she was separated at the time. So, yes, I understood that, but thank you. I appreciate it. We would request the court affirm the defendant's convictions and sentence. Thank you. Thank you. I'll pick up where Judge Arnn left off with Mr. Bobachek. The motion eliminated before trial flagged for the district court that there was this issue with Ms. Williams being married at the time that she was in this online romantic relationship with the imposter, Mr. Hardy. The government's position and the district court's conclusion is that Ms. Williams somehow opened the door to getting into that issue by testifying that she was in a relationship with Tom Hardy. Respectfully, Ms. Williams did not open the door. The issue was whether she was going to make herself sound particularly vulnerable as a single person or something like that and the fact of the matter is relevant evidence is evidence that has a tendency to make something more or less probable and it may not be great, but the fact that somebody is legally married when they're in an online relationship with somebody else does not make the believability of it any more or less likely and even if it has a modicum of relevance, the district case from this court makes clear there's a lot of prejudicial value whether it's only one question or two questions about suggesting that somebody is committing infidelity and on top of that that she, the suggestion was from the government, was that she was willing to do this for the imposter, Mr. Hardy, because he was getting a divorce and she was facilitating cheating Mr. Hardy's wife out of divorce funds, so it was a big issue again in a close case. What you just laid out was not argued to the jury as I understand it, right? I mean that, was that in the argument in the motion for a motion to eliminate or because that wasn't described to the jury, was it? This theory that she was sympathetic to him because he was in a divorce and she was in a divorce, that wasn't presented to the jury, was it? That wasn't our argument, it wasn't the government's argument either, but the crux of the government's argument in closing was that she could not possibly have believed that she was in this relationship with Tom Hardy and the inference from its question to Ms. Williams was that well she couldn't believe that because she was legally married at the time and our position is that that doesn't make it any more or less likely and it is highly prejudicial again as explained by the Bistro case. In Mr. Wawrczyk's discussion of the issue of the willful blindness instruction, he said something that gives me a lot of concern about this case and that is in response to the issue with what was going on with the banks, he said well this isn't what an ordinary person would do in response to getting bank accounts closed and money frozen, etc. That's not, again going back to the discussion with Judge Arnold at the outset, that's not what we're looking at. We're looking at Ms. Williams' subjective knowledge and Ms. Williams' subjective actions to avoid learning about the truth. Again, the whole thing seems quite odd in in hindsight, but it was not odd to her in the moment, and she was not willfully blind. If the court has no further questions, I'd ask the court to reverse Ms. Williams' conviction or in the alternative order resentencing. Thank you. Thank you to both counsel. Arguments have been very helpful and the briefing was as well, and we'll take the matter under advisement.